# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| BENITA DAWN GRAVES, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:12-cv-01242** |
| v. | ) | **Judge Nixon / Knowles** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's "Motion for Summary Judgment on the Record Social Security Disability Benefits."[2] Docket No. 12. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 14. Plaintiff has filed a Reply to Defendant's Response. Docket No. 17.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin should therefore be substituted for Commissioner Michael J. Astrue as the Defendant in this action. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Although Plaintiff entitles her document, "Motion for Summary Judgment on the Record Social Security Disability Benefits," the undersigned will construe it as a Motion for Judgment on the Administrative Record.

1

For the reasons stated below, the undersigned recommends that Plaintiff's "Motion for Summary Judgment on the Record Social Security Disability Benefits" be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed her application for Disability Insurance Benefits ("DIB") on April 21, 2008, alleging that she has been disabled since August 2, 2007, due to osteoarthritis, fibromyalgia, parathesia, migraines, and anxiety. *See, e.g.*, Docket No. 8, Attachment ("TR"), pp. 112, 133. Plaintiff's application was denied both initially (TR 45) and upon reconsideration (TR 46). Plaintiff subsequently requested (TR 66) and received (TR 84) a hearing. Plaintiff's hearing was conducted on April 13, 2010, by Administrative Law Judge ("ALJ") James Lessis. TR 22. Plaintiff and vocational expert ("VE"), Calvin Turner, appeared and testified. *Id.*

On March 18, 2011, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 8. Specifically, the ALJ made the following findings of fact:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.  The claimant has not engaged in substantial gainful activity since August 2, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: fibromyalgia, CMC joint osteoarthritis, migraine headaches, depression and anxiety (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

2

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to maintain employment at the level of lifting and carry [*sic*] a maximum of 10 pounds; to stand and walk 2 hours in an 8-hour workday; to sit 6 hours in an 8-hour workday; she is restricted to negligible climbing, balancing, kneeling, stooping, crouching, crawling; she is restricted to negligible use of pedals (foot controls); she is restricted to frequent reaching, handling, fingering, and feeling; and negligible exposure to extreme temperatures, vibrations, moving mechanical parts, electric shock, hazardous exposed places, radiation, explosives, and to fumes, odors, dust, gasses, and poor ventilation. Furthermore, she is limited to minimal contact with the public, co-workers, and supervisors. From a mental standpoint, the claimant has the reasoning, mathematical, and language (R-M-L) development to do the following: apply commonsense understanding to carry out detailed but uninvolved written or oral instructions; deal with problems involving a few concrete variables in or from standardized situations; add, subtract, multiply, and divide all units of measure; perform the four operations with like common and decimal fractions; compute ratio, rate, and percent; draw and interpret bar graphs; perform arithmetic operations involving all American monetary units; read a passive vocabulary of 5,000 to 6,000 words; read at a rate of 190-215 words per minute; read adventure stories and comic books, looking up unfamiliar words in a dictionary for meaning, spelling, and pronunciation; read instructions for assembling model cars and airplanes; write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs; speak clearly and distinctively with appropriate pauses and emphasis, correct pronunciation, and variations in word order, using present, perfect, and future tenses.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on June 1, 1963 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual

3

age 45-49 (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 2, 2007, through the date of this decision (20 CFR 404.1520(g)).

TR 10-16.

On May 18, 2011, Plaintiff timely filed a request for review of the hearing decision. TR 110. On September 27, 2012, the Appeals Council issued a letter declining to review the case (TR 1), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.  REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

### III.  CONCLUSIONS OF LAW

### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

5

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the

6

"listed" impairments[3] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

---

[3] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

7

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in failing to properly: (1) address and weigh the medical opinion evidence of record; (2) evaluate Plaintiff's credibility; (3) assess Plaintiff's residual functional capacity; and (4) determine the number of jobs that Plaintiff could perform. Docket No. 13.  Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded.  *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.  *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

### 1.  Medical Opinion Evidence

8

Plaintiff argues that the ALJ failed to properly consider and evaluate the medical opinion evidence of record. Docket No. 13 at 7. Specifically, Plaintiff argues that the ALJ should have accorded greater weight to the opinions of treating and examining physicians Drs. C. Rob Dyer, Steven Larson, Edmundo Magpantay, Jane Siegel, Bruce Butler, John Yuill, M. Farooq Ali, and Randall Curtis, because those opinions demonstrate that Plaintiff's left-hand impairment proves that she is disabled. *Id.* at 9-11, *citing* TR 80-81, 426-27, 454, 456, 674, 676, 745, 891, 1093. Plaintiff alleges that the ALJ erroneously considered only the opinions of Dr. Yuill and Dr. Magpantay, and that the ALJ's consideration of their opinions was narrowly circumscribed, as it failed to note that both physicians agreed that Plaintiff could not perform repetitive hand motion. *Id.* at 11, *referencing* TR 13, 674, 891. Plaintiff asserts that an ALJ's dismissal of a treating physician's opinion requires an explicit and specific rationale, and that, in the instant case, the ALJ failed to provide that specificity. *Id.* at 12; *citing Bowen v. Commissioner*, 478 F.3d 742, 748 (6th Cir. 2007).

Defendant maintains that the ALJ properly evaluated the medical opinions and evidence of record. Docket. No. 14 at 8-13. Defendant asserts that, as a preliminary matter, not all physicians' statements are medical opinions as defined by 20 C.F.R. § 404.1527(a)(2),[4] and that an ALJ is not bound by physicians' conclusory statements that are unsupported by objective medical evidence. *Id.* at 8; *citing* 20 C.F.R. § 404.1527(a)(2); *Buxton v. Halter*, 246 F.3d 762,

---

[4] 20 C.F.R. § 404.1527(a)(2) states:

> Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgment(s), about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical condition.

9

773 (6th Cir. 2001). Defendant also asserts that, regardless, each of the eight physicians' notes and opinions is not inconsistent with the ALJ's findings. *Id.* at 9-13.

Regarding Dr. Dyer, Defendant asserts that Dr. Dyer's statement discussed by Plaintiff was merely a note to be given to Plaintiff's employer regarding her left-thumb pain and her ability to perform her mail carrier job, and was not a medical opinion. *Id.* at 9, *citing* TR 13, 426-27. Additionally, Defendant maintains that Dr. Dyer's note did not preclude all types of work. *Id.*

Discussing Dr. Larson, Defendant similarly claims that the note Plaintiff cited was a request for a one-day medical leave, and not a medical opinion. *Id.*, *citing* TR 456. With regard to Dr. Magpantay, who performed a Fitness-for-Duty (FFD) examination, Defendant claims that the note referenced by Plaintiff was likewise not a medical opinion, and that Dr. Magpantay did not consider Plaintiff's impairments for Social Security purposes. *Id.* at 9-10, *citing* TR 13-14, 668-70, 674.

Addressing Dr. Siegel, Defendant notes that, although Plaintiff argues that Dr. Siegel's statement purported that Plaintiff could not do any job requiring left-thumb gripping, Dr. Siegel's statement, in fact, stated that Plaintiff had only "mild" arthritis and could return to work with splints. *Id.* at 10, *citing* Docket No. 13 at 10; TR 676, 677, 682, 686. As with the previous physicians' statements, Defendant argues that Dr. Siegel offered no medical opinion regarding Plaintiff's ability to do other jobs. *Id.* at 10-11.

Regarding Dr. Butler, Defendant argues that: his report summarizes Dr. Magpantay's previous assessment; the "report is not a medical opinion under SSA's regulations;" it is not inconsistent with the ALJ's findings; and Dr. Butler is not a treating or examining physician. *Id.*

10

at 11, *citing* TR 744-746. Defendant then notes that Dr. Yuill's medical opinion speaks only to Plaintiff's ability to complete postal duties and is not applicable to a Social Security determination, nor is it inconsistent with the ALJ's finding that Plaintiff could perform other jobs. *Id.* at 11-12, *citing* TR 23, 686, 891, 1009.

Defendant also addresses Dr. Ali's RFC assessment, which opines that Plaintiff could sit, stand, and walk for less than an hour. *Id.* at 12, *citing* TR 80. Defendant claims this assessment is not supported by objective medical evidence (including Dr. Ali's own examination findings) or by Plaintiff's subjective complaints. *Id.* at 12, *citing* TR 149, 168, 188, 428-29. Finally, regarding Dr. Curtis, Defendant argues that his statement was not a medical opinion but a legal conclusion, and as such, the ALJ was not required to give it any "special significance." *Id.* at 13, *citing* 20 C.F.R. § 404.1527(e)(3)*, referencing* TR 1093. Defendant additionally notes that Dr. Curtis's statement was rendered after the ALJ's decision, and it would thus have been impossible for the ALJ to consider it. *Id.*, *citing* TR 1093.

Plaintiff replies that the statements made by Drs. Magpantay, Seigel, Butler, Yuill, Ali and Curtis are, in fact, medical opinions.[5] Docket No. 17 at 1-7. Plaintiff specifically argues that Dr. Magpantay's statement that Plaintiff "could potentially drop objects she carries," is a medical opinion within the meaning of 20 C.F.R. § 404. 1527(a)(2). *Id.* at 2, *quoting* TR 675. Plaintiff also asserts in her Reply that Defendant's reasoning for rejecting the RFC assessment of Dr. Ali was not discussed by the ALJ, so this reasoning cannot be applied *post hoc* to correct the ALJ's error. *Id.* at 5, *citing* Docket No. 14 at 12. Finally, Plaintiff replies that Dr. Curtis'

_____

[5] Plaintiff's Reply does not address whether the statements made by Drs. Dyer and Larson are medical opinions.

opinion should have been considered by the ALJ. *Id.* at 6-7, *referencing* TR 1093.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
>
> (3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...
>
> (4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

12

(5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.
. . .

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

The ALJ must articulate the reasons underlying his decision to give a medical opinion a specific amount of weight.[6]  *See, e.g.,* 20 C.F.R. § 404.1527(d); *Allen v. Commissioner*, 561 F.3d 646 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004).  The reasons must be supported by the evidence and must be sufficiently specific so as to make clear to any subsequent reviewers the weight the ALJ gave to the treating source medical opinion and the reasons for that weight.  SSR 96-2p.

The Sixth Circuit has held that, "provided that they are based on sufficient medical data, the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are un-contradicted, complete deference."  *Howard v. Commissioner*, 276 F.3d 235, 240 (6th Cir. 2002) (*quoting Harris v. Heckler*, 756 F.3d 431, 435 (6th Cir. 1985)).  If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

---

[6] There are circumstances when an ALJ's failure to articulate good reasons for the weight accorded to medical opinions may constitute harmless error: (1) if a treating source opinion is so patently deficient that the ALJ could not possibly credit it; (2) if the ALJ adopts the opinion or makes findings consistent with the opinion; and/or (3) if the ALJ has complied with the goal of 20 C.F.R. §1527(d), by analyzing the physician's contradictory opinions or by analyzing other opinions of record.  *See, e.g., Friend v. Commissioner*, 375 Fed. Appx. 543, 551 (6th Cir. April 28, 2010); *Nelson v. Commissioner*, 195 Fed. Appx. 462, 470-72 (6th Cir. 2006); *Hall v. Commissioner*, 148 Fed. Appx. 456, 464 (6th Cir. 2006).

> [Y]our own physician, psychologist, or other acceptable medical
> source who provides you or has provided you, with medical
> treatment or evaluation and who has, or has had, an ongoing
> treatment relationship with you.

20 C.F.R. § 404.1502.

In the instant case, the ALJ discussed the medical evidence of record at length. TR 12-14. Although Plaintiff is correct that the ALJ did not mention each physician by name, as will be discussed in greater detail below, the ALJ did appropriately consider the physician records. Docket No. 13 at 11; TR 11-14.

Plaintiff contends that the ALJ should have considered that, on June 4, 2007, Dr. Rob Dyer ordered Plaintiff to stop working until further notice because of "degenerative arthritis at the base of her thumb with early breakdown." Docket No. 13, at 9, *quoting* TR 426. As an initial matter, TR 426 is an "office note" from Dr. Dyer reporting x-ray and examination results. In that note, Dr. Dyer indicated that he gave Plaintiff an injection, a brace, and a "note to return to work in two days." TR 426. Contrary to Plaintiff's assertion, Dr. Dyer did not "order[] Plaintiff to stop working until further notice." In fact, as noted, Dr. Dyer explicitly stated that he gave Plaintiff a "note to return to work in two days." TR 426.

Dr. Dyer is a physician practicing with Tennessee Orthopaedic Alliance ("TOA").[7] Dr. Dyer's treatment records are contained in Exhibits 4F and 15F. *See* TR 412-27, 676-702. The ALJ directly referenced Dr. Dyer's treatment notes and TOA medical records as follows:

> The medical evidence shows that the claimant has a history of
> osteoarthritis in her left hand and CMC joint of her left thumb,

_____

[7] Tennessee Orthopaedic Alliance records dated February 1, 2005 to August 9, 2007 are designated as Exhibit 4F (TR 412-27), while TOA records dated February 1, 2005 to April 23, 2008 are designated as Exhibit 15F (TR 676-702).

14

fibromyalgia, arthritis in her neck and knees, shoulder pain,
anxiety, and migraine headaches (Exhibits 2F, 3F, and 4F). . . .

. . .

. . . She reported some improvement of her shoulder pain in June
2007 after receiving an injection (Exhibit 4F/31)[8]. . . .

. . . On January 9, 2008, she reported less pain when wearing the
CMC splint (Exhibit 15F/8). . . .Orthopedic office note dated
March 27, 2008 indicated that she only reported mild numbness in
her neck region and occasional weakness in her hands (Exhibit
15F/6).

. . .

. . . Examination of her right shoulder in April 2007 revealed
nearly full passive and active range of motion as well as good
rotator cuff strength and only mild pain in her AC joints and with
supraspinatus testing (Exhibit 4F/11).

She reported some improvement in her right shoulder pain in June
2007 after receiving an injection (Exhibit 4F/31). In October 2007,
she reported less pain in her left hand while wearing her CMC
splint (Exhibit 15F/8). . . . At an orthopedic examination the same
month, she reported only mild numbness in her neck region and
only occasional weakness in her hands (Exhibit 15F/6). . . .

TR 12-14, *citing* TR 261-93, 294-411, 412-27, 681, 683 (footnote added).

    As can be seen, the ALJ considered TOA medical records, and, specifically, Dr. Dyer's

treatment notes from Plaintiff's June 4, 2007 visit.  TR 12-14, 424.  Plaintiff's contention that the

ALJ considered only the opinions of Dr. Yuill and Dr. Magpantay fails.

    Plaintiff also contends that the ALJ failed to consider the medical opinion of Dr. Steven

Larson. Docket No. 13 at 9-12.  Specifically, Plaintiff contends that the ALJ should have

_____

     [8] The ALJ cites Exhibit 4F/31. There is no page 31 within this Exhibit, however. It is
presumed from the context that the ALJ meant to reference page 13 of Exhibit 4F, and that the
notation of page 31 was simply a typographical error. TR 13, 14, 424.

15

considered that, on October 30, 2007, Dr. Larson ordered a brace for Plaintiff's left wrist, limited her to lifting no more than 10 pounds, pushing and pulling as tolerated, and avoiding work that increases her pain. *Id.*, *referencing* TR 456. Significantly, TR 456 is an excuse from work note verifying that Plaintiff had a doctor's appointment on October 30, 2007, and delineating her work limitations. The note explicitly states that it, "Expires - 8 weeks." *See* TR 456.

Dr. Larson practices with American Orthopedics and Sports Medicine, and his treatment notes are contained in Exhibits 6F. *See* TR 430-57. The ALJ explicitly discussed evidence within Exhibits 6F as follows:

> MRI of her cervical spine on April 27, 2007 showed a congenital fusion at C6-7 level and minimal disc bulging at C5-6, which did not efface the cord or nerve roots (Exhibit 6F/7). . . . She underwent physical therapy for CMC joint pain (Exhibits 6F/12-16 and 7F/20-39).
>
> . . .
>
> The claimant has received treatment for her osteoarthritis in her joints, fibromyalgia, and neck and back pain, but this treatment has been conservatively [*sic*] in nature and she has responded well to the treatment. Objective evidence only revealed minimal disc bulging in her cervical spine (Exhibit 6F/7) . . .

TR 13, *citing* TR 436, 441-45, 477-96.

The ALJ's discussion of evidence within Exhibit 6F demonstrates that he was aware of Dr. Larson's treatment notes, as they are contained within that Exhibit; Plaintiff's contention to the contrary is unavailing.

Plaintiff next argues that the ALJ did not properly consider the opinion of Dr. Edmundo

16

Magpantay.  Docket No. 13 at 9, 11.  Specifically, Plaintiff contends that, on April 10, 2008,[9] Dr.

Magpantay noted that Plaintiff experienced pain and weakness in her left hand, pain and stiffness

in her head and neck, and an inability to concentrate fully on her work as a result, all of which

the ALJ should have considered.  *Id., referencing* TR 674.  Plaintiff also contends that the ALJ

considered only the part of Dr. Magpantay's opinion that Plaintiff would not be able to perform

her work as a rural mail carrier, and failed to address the expressed limitation that Plaintiff could

not perform repetitive hand motion.  *Id.*, at 11.  Dr. Magpantay's treatment notes are contained

within Exhibits 14F and 18F.  *See* TR 667-75, 885-90.

The ALJ addressed Dr. Magpantay's opinion as follows:

> On April 16, 2008, she underwent a Fitness-For-Duty Evaluation
> (FFDE).  Dr. Magpantay opined that the claimant was unable to
> perform repetitive motion due to osteoarthritis; and was unable to
> perform the duties of a rural carrier due to Fibromyalgia,
> migraines, and anxiety and panic attacks (Exhibit 14F).  The
> claimant reported on April 28, 2008 that the Lidocaine patches
> were helping over her neck and shoulder (Exhibit 28F/15).
>
> . . .
>
> As for the opinion evidence, both Dr. Magpantay and Dr. Yuill
> opined that the claimant was unable to perform her past relevant
> work as a rural mail carrier (Exhibits 14F and 19F).  The
> undersigned concurs with their opinions.  However, she is not
> precluded from all work.  The vocational expert identified a
> signification [*sic*] number of jobs she could perform with her
> current residual functional capacity.

TR 13-14, *citing* TR 667-75, 891-941, 1007.

As an initial matter, the Fitness-For-Duty Evaluation explicitly referenced by the ALJ is

_____

[9] Although Plaintiff contends that Dr. Magpantay made these findings on April 10, 2008, the note on TR 674 is actually dated April 16, 2008, and is the same record discussed by the ALJ in his opinion.  *See* TR 674.

the same record Plaintiff argues the ALJ should have considered. Moreover, contrary to Plaintiff's assertion, the ALJ specifically noted that Dr. Magpantay opined that Plaintiff was unable to perform repetitive motion due to osteoarthritis, and the ALJ noted Plaintiff's report that Lidocaine patches were helping. The ALJ properly considered Dr. Magpantay's Fitness-For-Duty Evaluation and concurred with his assessment. Plaintiff's argument regarding the ALJ's consideration of Dr. Magpantay's opinion thus fails.

Plaintiff also argues that the ALJ failed to properly consider Dr. Jane Seigel's opinion that Plaintiff "could not do any job which would require repetitive or ongoing gripping with that left thumb." Docket. No. 13 at 10, *referencing* TR 676. Dr. Seigel practices with TOA, and her treatment notes are contained within Exhibit 15F. TR 676-702.

As a preliminary matter, the statement to which Plaintiff refers is not a medical opinion as defined by 20 C.F.R. § 404.1527(a)(2). *See* TR 676. Regardless, as has been discussed above with regard to his consideration of the opinion of Dr. Dyer, the ALJ properly considered the records from TOA. TR 12-14, *citing* TR 412-27, 676-702. Plaintiff's argument about Dr. Seigel's statement is unavailing.

Regarding the May 2, 2008 Fitness-For-Duty Evaluation of Dr. Bruce Butler wherein Dr. Butler opined that "due to the inability to perform repetitive motions with the hands (especially the left hand) the likelihood of dropping an item due to the inability to grasp or carry is very likely," Plaintiff is correct in noting that the ALJ did not directly discuss it. Docket No. 13 at 10-11, *referencing* TR 745. Records from Dr. Butler are contained within Exhibits 17F and 18F. TR 744-884, 885-890.

Dr. Butler is a non-examining consulting physician who completed a Fitness-For-Duty

18

Evaluation specifically pertaining to Plaintiff's ability to perform her job as a rural mail carrier. TR 744-46.  Significantly, the ALJ agreed that Plaintiff could not return to her past work as a rural mail carrier.  TR 14.  Additionally, Dr. Butler's evaluation simply summarizes the findings of Dr. Magpantay's assessment and treatment notes from other physicians that the ALJ did discuss.  TR 12-14, 667- 75, 744-46.  Because the ALJ discussed the evidence considered by Dr. Butler, and actually concurred that Plaintiff was unable to return to her past work as a rural mail carrier, the ALJ's failure to explicitly discuss Dr. Butler's findings constitutes harmless error; Plaintiff's argument on this point fails.

Plaintiff next contends that the ALJ failed to consider Dr. John Yuill's May 23, 2008 opinion that Plaintiff could not "perform repetitive hand motion required to sort and collect letters and parcels."  Docket No. 13 at 10-12.  Dr. Yuill's records are contained in Exhibit 19F. TR 891-941.

Discussing Dr. Yuill's opinion, the ALJ stated:

> A letter dated May 23, 2008 from Dr. Yuill indicated that he concur [*sic*] that the claimant had findings of fibromyalgia which cause diffused muscle pain and left had [*sic*] osteoarthritis that impaired her ability to perform repetitive motion.  He further stated that given those impairments, she did not seem capable of performing all of the duties of a rural carrier as described, more specifically, he doubted that she could lift 70 pounds or perform the repetitive hand motion required to sort and collect letters and parcels (Exhibit 19F).
> . . .
>
>  As for the opinion evidence, both Dr. Magpantay and Dr. Yuill opined that the claimant was unable to perform her past relevant work as a rural mail carrier (Exhibits 14F and 19F).  The undersigned concurs with their opinions.  However, she is not precluded from all work.  The vocational expert identified a signification [*sic*] number of jobs she could perform with her current residual functional capacity.

19

TR 13-14, *citing* TR 667-75, 891-941.

As discussed above with regard to Drs. Magpantay and Butler, Dr. Yuill's opinion addresses Plaintiff's ability to perform her duties as a rural mail carrier. TR 667-75, 744-46, 891-941. As previously noted, the ALJ actually concurred with Dr. Yuill's assessment that Plaintiff was unable to return to her past work as a rural mail carrier. TR 13, 14, *citing* TR 891-941. Additionally, although Plaintiff argues that the ALJ failed to consider Dr. Yuill's opinion that Plaintiff could not "perform repetitive hand motion required to sort and collect letters and parcels," as can be seen in the quoted passage above, the ALJ explicitly so noted in his discussion of Dr. Yuill's opinion. Docket No. 13 at 10, 11; TR 13,14, *citing* TR 891-941. Plaintiff's contention that the ALJ's consideration of Dr. Yuill's opinion was narrowly circumscribed is unavailing.

Plaintiff next maintains that the ALJ failed to consider the Physical Capacities Evaluation completed by Dr. M. Farooq Ali. Docket No. 13 at 10, 11, *citing* TR 80-81; *see also* Docket No. 17 at 5. Plaintiff contends that Dr. Ali limited her "in a number of ways that equated to a finding of disability," and specifically agreed that she could not push or pull with her hand, or perform fine manipulation, including gripping and grasping. *Id.* Dr. M. Farooq Ali is an attending physician at Portland Medical Center and Plaintiff's treating rheumatologist, whose treatment notes are contained within Exhibits 5F, 9F, 10F, and 28F. TR 428-29, 578-88, 589-613, 993-1024.

Plaintiff correctly asserts that the ALJ failed to explicitly mention Dr. Ali's Physical Capacities Evaluation of Plaintiff; the ALJ did, however, consider Dr. Ali's treatment notes,

20

exemplifying that the ALJ was aware of his assessment. TR 13-14. Discussing Dr. Ali's

records, the ALJ stated:

> . . . She was evaluated on August 21, 2007 for polyarthralgias. She reported generalized aches and pains, feeling of tiredness, fatigue, unrefreshed sleep with poor sleep hygiene. She had mild osteoarthritis in her hands but no synovitis, tenderness with palpitation in the first CMC joint in her left hand, bicipital tendinitis with positive impingement signs in her right shoulder, and right subacromina bursa tenderness. She had a full range of motion in her other joints and some tender areas over the front and back of her torso. The assessment was localized osteoarthritis and fibromyalgia. She was advised to do some mild aerobic exercises, at least two to three times a week (Exhibits 28F/2-3). . . .

> . . .

> . . . The claimant reported on April 28, 2008 that the Lidocaine patches were helping over her neck and shoulder (Exhibit 28F/15).

> . . .

> Progress notes dated August 14, 2008 indicated that she had a MRI of her neck and lumbar spine was [*sic*] within normal limits. She had mild osteoarthritis changes in her hands with no synovitis, tenderness with palpation in the first CMC joint, positive impingement signs with subacromial bursae [*sic*] tenderness, but full range of motion in her other joints. She also had some tenderness over the areas of the front and back of her torso, paired trigger points and crepitus in her knees (Exhibit 28F/17). She reported on February 19, 2009 that the trigger pint [*sic*] injections had only a mild effect on her pain but that the Lidocaine patches were helping over her neck and shoulders (Exhibit 28F/19). September 21, 2009, it was noted that she had many complaints due to weather changes. She was also diagnosed with plantar fasciitis (Exhibit 28F/24).

> . . .

> In February 2009, she reported that the Lidocaine patches were helping with the pain over her neck and shoulders (Exhibit 28F/19).

TR 13-14, *citing* TR 994-95, 1007, 1009, 1011, 1016.

Dr. Ali was Plaintiff's treating rheumatologist, a fact that would justify the ALJ's according great weight to his opinion, as long as that opinion was supported by medically acceptable clinical and laboratory diagnostic techniques, and consistent with the evidence of record. In the September 21, 2009 Physical Capacities Evaluation at issue, Dr. Ali opined that Plaintiff could sit and/or stand/walk for less than 1 hour at a time in an 8-hour day; grasp with both hands, but not push and pull or do fine manipulation with either hand; could not use feet and/or legs for repetitive movements; could never lift and/or carry over 20 pounds, rarely lift 10-19 pounds, and occasionally lift up to 9 pounds; could rarely bend, squat, and crawl, and occasionally climb and reach above shoulder; and was severely restricted in activities involving unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, driving automobile equipment, and being exposed to dust, fumes, and gases. TR 80-81.

Significantly, Dr. Ali's September 21, 2009 Physical Capacities Evaluation contradicts other substantial evidence in the record, including his own treatment notes. As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence of record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* When the opinions are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2).

22

As can be seen in the quoted passages above, the ALJ's decision demonstrates that he considered Dr. Ali's records. TR 13-14. Because Dr. Ali's September 21, 2009 Physical Capacities Evaluation contradicts other substantial evidence in the record, including his own treatment notes, the Regulations do not mandate that the ALJ accord Dr. Ali's evaluation great or controlling weight. Accordingly, Plaintiff's argument fails.

Finally, Plaintiff argues that the ALJ failed to properly consider Dr. Randall Curtis' April 6, 2011[10] finding that, due to her fibromyalgia, degenerative disc disease, headaches, osteoarthritis, and anxiety with panic attacks, Plaintiff was unable to "perform in any gainful employment position." Docket No. 13 at 10-12, *quoting* TR 1093; *see also* Docket No. 17 at 6-7. As a preliminary matter, Dr. Curtis' April 6, 2011 opinion is dated three weeks after the ALJ's March 18, 2011 decision was rendered. TR 8-16, 1093. Accordingly, the ALJ could not have considered it prior to rendering a decision. Significantly, however, Dr. Curtis' records, contained in Exhibit 32F, were considered by the Appeals Council as part of the additional evidence it received and reviewed. TR 4. Even after reviewing Dr. Curtis' records (along with the remainder of the additional evidence it received), the Appeals Council found no basis for disturbing the ALJ's decision. TR 1-4.

Moreover, Dr. Curtis' statement, "Mrs. Graves is unable to perform in any gainful employment position" (TR 1093), is not a medical opinion as defined by 20 C.F.R. § 404.1527(a)(2) because it expresses a legal conclusion reserved for the Commissioner. As

---

[10] Although Plaintiff's supporting Memorandum indicates that Dr. Curtis' finding was made on April 6, 2001, that date appears to be a typographical error, as the referenced finding was actually made on April 6, 2011. *See* TR 1093.

discussed in 20 C.F.R. § 404.1527(e)(3), when physicians render opinions on issues reserved to the Commissioner, the opinion will not be given "any special significance." Finally, the ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by objective criteria and documentation. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). In the case at bar, Dr. Curtis' opinion is not supported by any accompanying treatment or assessment notes reflecting objective medical evidence. TR 1085-1130.

Because Dr. Curtis' opinion was rendered after the ALJ's decision, was considered by the Appeals Council, was a legal conclusion reserved for the Commissioner, and was unsupported by treatment notes or other objective medical evidence, Plaintiff's argument regarding Dr. Curtis' opinion fails.

Plaintiff argues that, "[b]ecause the ALJ found that Plaintiff was not disabled, he clearly rejected in whole or in part the opinions of the eight physicians" discussed above. Docket No. 13 at 11. Plaintiff contends that this must be the case because "every physician of record (other than the DDS physicians) . . . agreed that Plaintiff is either disabled or functionally disabled (not able to grasp or use her left thumb repetitively." *Id.* As has been discussed above, the issue of disability is an issue reserved to the Commissioner; accordingly, the ALJ is not bound by a physician's finding that Plaintiff is either "disabled" or "functionally disabled." Plaintiff's contention that, " [b]ecause the ALJ found that Plaintiff was not disabled, he clearly rejected in whole or in part the opinions of the eight physicians" discussed above is simply an assumption; and one that, for the reasons discussed above, is unavailing.

For the foregoing reasons, the ALJ has properly considered and weighed the opinion evidence of record; and has appropriately articulated the reasons for his decision. Plaintiff,

24

therefore, cannot prevail on this statement of error.

## 2.  Plaintiff's Credibility

Plaintiff contends that in finding that her subjective complaints were not fully credible, the ALJ did not appropriately address her complaints of pain. Docket No. 13 at 13-17. Specifically, Plaintiff argues that the ALJ discounted the credibility of her subjective complaints by claiming generally that there were inconsistencies between Plaintiff's complaints and the objective medical evidence. *Id.* at 15, *citing* TR 14.  Plaintiff takes issue with the fact that the ALJ failed to explain what those reported inconsistencies were.  *Id.* at 15-17.  Plaintiff further contends that the ALJ failed to consider the nature of fibromyalgia, which waxes and wanes in severity, and was supported by Plaintiff's statements. *Id.*, *referencing* TR 25-38.  Plaintiff additionally contends that Plaintiff's testimony was corroborated by the "testimony" of Plaintiff's supervisor, James Wilson, which the ALJ failed to consider (*Id.* at 16, *citing* TR 210-12), and by her increasing problems with pain and fatigue that spanned seven years of treatment and diagnoses (*Id.* at 16-17, *citing* TR 249-1130).  Plaintiff maintains that her subjective complaints have remained consistent, and that her seeking treatment from "numerous specialists in including [*sic*] [a] rheumatologist, a neurologist and a pain specialist," as well as "a physical therapist and a chiropractor" further substantiate her claims.  *Id.*

Defendant responds that the ALJ properly found that Plaintiff's subjective complaints were not fully credible. Docket No. 14 at 13-15.  Defendant notes that the ALJ supported his determination by referencing the existence of inconsistencies between Plaintiff's statements, Plaintiff's reported daily activities, and the objective medical evidence. *Id.* at 13-14.  Defendant highlights several inconsistencies and argues that, given these inconsistencies, the ALJ's

determination was appropriate. *Id.* at 14. Defendant also notes, "subjective complaints alone cannot provide a basis for a finding of disability." *Id.* Defendant asserts that although Plaintiff was advised by physicians to stop smoking and to lose weight, Plaintiff failed to follow these admonitions, and her health continued to deteriorate. *Id.* at 14-15, *citing* TR 561-62, 567, 952-53, 616-17, 1033, 1047. Defendant argues that Plaintiff's noncompliance with physicians' recommendations undermines her credibility. *Id.* at 15, *citing, e.g., Vorholt v. Commissioner*, 409 Fed. Appx. 883, 888 (6th Cir. 2011).

Plaintiff replies reemphasizing her original argument that the ALJ failed to consider the inherent nature of fibromyalgia. Docket No. 17 at 7. Plaintiff maintains that the fact that a disease is little understood by the medical community does not make the disease less disabling. *Id.*

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations of pain:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the

ALJ's personal observations, and the objective medical evidence contradict each other."). Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the case at bar, the ALJ ultimately found that Plaintiff's subjective complaints were not fully credible, stating:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause some of the alleged symptoms, but the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment (SSR 96-7p). The finding of diminished credibility is supported by inconsistencies between the claimant's allegations and the paucity of objective medical evidence.

27

TR 14.

Discussing Plaintiff's subjective complaints and the treatment related thereto, the ALJ

stated:

> The claimant testified that she has fibromyalgia with pain in her
> neck, shoulder, knees, feet, back and hands, which was worse with
> changes in the weather. She testified she has had shots in her left
> thumb as well as therapy, she wears a hand brace, and she had
> carpal tunnel syndrome and a cyst on her right hand. She testified
> she has migraine, cluster, and tension headaches and has migraine
> headaches about three times a week, cluster headaches once or
> twice every two weeks, and tension headaches two to three times a
> week. She claimant [*sic*] testified that her headaches are
> sometimes triggered by certain smells. She testified that she uses a
> TENs unit and pain patch for neck tension. The claimant testified
> she had some breathing problems, bronchitis which had pretty
> much resolved. She that [*sic*] she has problems with her feet
> (plantar fasciitis), and has worn orthopedic shoes since 2005,
> which helps support her feet but does not resolve the swelling and
> pain. The claimant testified that she has received treatment for her
> shoulders but still has problems with mobility, movement and
> stiffness. She testified that she has problems sleeping and feels
> groggy, tired, and irritable during the day. She testified she was
> depressed due to loss of job.
>
> The claimant testified that she could probably lift or carry a pound,
> she drops things constantly, she has problems squatting due to her
> hips and knees, she has problems bending, she can sit for 30
> minutes, she can stand for five to ten minutes, and she has
> difficulty with her right hand and her finger will sometimes lock.
>
> The medical evidence shows that the claimant has a history of
> osteoarthritis in her left hand and CMC joint of her left thumb,
> fibromyalgia, arthritis in her neck and knees, shoulder pain,
> anxiety, and migraine headaches (Exhibits 2F, 3F, and 4F). MRI
> of her right shoulder in April 2007, showed no evidence of rotator
> cuff tear, tendinopathy within the supraspinatus and infraspinatus,
> and AC joint hypertrophic and degenerative changes (Exhibit
> 3F/51). Examination of her right shoulder on April 11, 2007
> revealed nearly full passive and active range of motion as well as
> good rotator cuff strength and mild pain at her AC joints and with

28

supraspinatus testing.  The assessment was impingement (Exhibit 4F/11).

MRI of her cervical spine on April 27, 2007 showed a congenital fusion at C6-7 level and minimal disc bulging at C5-6, which did not efface the cord or nerve roots (Exhibit 6F/7).  She reported some improvement of her shoulder pain in June 2007 after receiving an injection (Exhibit 4F/31).  She was evaluated on August 21, 2007 for polyarthralgias.  She reported generalized aches and pain, feeling of tiredness, fatigue, unrefreshed sleep with poor sleep hygiene.  She had mild osteoarthritis in her hands but no synovitis, tenderness with palpitation in the first CMC join in her left hand, bicipital tendinitis with positive impingement signs in her right shoulder, and right subacromina bursa tenderness.  She had a full range of motion in her other joints and some tender areas over the front and back of her torso.  The assessment was localized osteoarthritis and fibromyalgia.  She was advised to do some mild aerobic exercises, at least two to three times a week (Exhibits 28F/2-3).  She underwent physical therapy for CMC joint pain (Exhibits 6F/12-16 and 7F/20-39).

MRI of her left hand on October 16, 2007 showed only mild trapezium-first metacarpal effusion, and early trapezium-first metacarpal osteoarthritis (Exhibit 3F/46).  On January 9, 2008, she reported less pain when wearing the CMC splint (Exhibit 15F/8).  She reported on January 30, 2008 that she had left facial and neck paresthesias, headaches, and neck and back pain.  She had tenderness over her back and shoulders but good movement (Exhibit 11F/1).  At a follow-up visit on March 7, 2008, she reported that she did not take the Elavil because it was an antidepressant and she did not like to get Botox injections for her headaches.  She was neurological [*sic*] intact.  It was noted that her examination was normal except for headaches (Exhibits 13F/1-3).  Orthopedic office note dated March 27, 2008 indicated that she only reported mild numbness in her neck region and occasional weakness in her hands (Exhibit 15F/16).

On April 16, 2008, she underwent a Fitness-For-Duty Evaluation (FFDE). . . . The claimant reported on April 28, 2008 that the Lidocaine patches were helping over her neck and shoulder (Exhibit 28F/15).

. . .

29

Progress notes dated August 14, 2008 indicated that she had a MRI of her neck and lumbar spine was [*sic*] within normal limits. She had mild osteoarthritis changes in her hands with no synovitis, tenderness with palpation in the first CMC joint, positive impingement signs with subacromial bursae tenderness, but full range of motion in her other joints. She also had some tenderness over the areas of the front and back of her torso, paired trigger points and crepitus in her knees (Exhibit 28F/17). She reported on February 19, 2009 that the trigger pint [*sic*] injections had only a mild effect on her pain but that the Lidocaine patches were helping over her neck and shoulders (Exhibit 28F/19). September 21, 2009, it was noted that she had many complaints due to weather changes. She was also diagnosed with plantar fasciitis (Exhibit 28F/24).

. . .

The claimant has received treatment for her osteoarthritis in her joints, fibromyalgia, and neck and back pain, but this treatment has been conservatively [*sic*] in nature and she has responded well to the treatment. Objective evidence only revealed minimal disc bulging in her cervical spine (Exhibit 6F/7), no evidence of rotator cuff tear in her right shoulder, but tendinopathy within the supraspinatus and infraspinatus as well as AC joint hypertrophic and degenerative changes (Exhibit 3F/51), and mild trapezium-first metacarpal effusion and early trapezium-first metacarpal osteoarthritis in her left hand (Exhibit 3F/46). Examination of her right shoulder in April 2007 revealed nearly full passive and active range of motion as well as good rotator cuff strength and only mild pain in her AC joints and with supraspinatus testing (Exhibit 4F/11).

She reported some improvement in her right shoulder pain in June 2007 after receiving an injection (Exhibit 4F/31). In October 2007, she reported less pain in her left hand while wearing her CMC splint (Exhibit 15F/8). When she was seen on March 7, 2008 for her neurological complaints, she was neurological [*sic*] intact. She had normal muscle bulk and normal strength in all extremities. It was noted that her examination was normal except for her headaches (Exhibit 13F/1-3). At an orthopedic examination the same month, she reported only mild numbness in her neck region and only occasional weakness in her hands

30

(Exhibit 15F/6). In February 2009, she reported that the Lidocaine patches were helping with the pain over her neck and shoulders (Exhibit 28F/19).

TR 12-14, *citing* TR 25-38, 261-93, 299-411, 412-27,[11] 430-57, 458-650, 614-53, 660-66, 676-702, 891-941, 993-1024.

As can be seen, the ALJ's decision specifically addresses in detail not only the medical evidence, but also Plaintiff's testimony and her subjective claims, clearly indicating that these factors were considered. TR 12-14. Although Plaintiff complains that the ALJ committed reversible error by not discussing her activities of daily living, interestingly, Plaintiff did not directly testify to her activities of daily living at her hearing. *See* TR 22-44. In response to questions posed both by the ALJ and by her attorney, Plaintiff testified about her medical history and diagnoses, her pain and associated triggers and limitations, her treatment and pain relief measures, her medications and their side effects, and her functional limitations, but not specifically about her activities of daily living. As can be seen in the ALJ's discussion of the evidence of record, the ALJ accurately and thoroughly recounted Plaintiff's testimony. With regard to Plaintiff's testimony that she very seldom went out because she did not feel comfortable in public and that she did not have any social outlets, club memberships or attend church because she felt "like people are looking at [her]" (TR 37-38), the ALJ considered this testimony in determining that Plaintiff experienced bipolar disorder, depression, and anxiety; that Plaintiff's depression and anxiety were severe impairments; and that Plaintiff's mental impairments did not meet or medically equal Listing 12.04 (affective disorders), Listing 12.06

_____

[11] As previously noted, the ALJ cites Exhibit 4F/31. Exhibit 4F, however, does not have 31 pages, and given the context, it is likely that the ALJ intended to cite Exhibit 4F/13. TR 14, 424.

(anxiety related disorders), or any other Listing. TR 10-11. Additionally, the ALJ considered this testimony when ultimately finding that Plaintiff was "limited to minimal contact with the public, co-workers, and supervisors." TR 11, numbered para. 5. Plaintiff's contention on this point fails.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

As discussed above, after assessing all the objective medical evidence and Plaintiff's testimony and subjective complaints, the ALJ determined that Plaintiff's subjective complaints of pain were not fully credible. TR 14. Plaintiff claims that in so doing, the ALJ did not properly consider the inherent nature of fibromyalgia or the various treatments obtained by Plaintiff. Docket No. 13 at 15; Docket No. 17 at 7. As has been demonstrated in the quoted

32

passages above, however, the ALJ explicitly found Plaintiff's fibromyalgia to be a severe impairment and specifically discussed Plaintiff's complaints of fibromyalgia and associated pain and limitations, as well as the objective testing she underwent and the treatment she received from various sources. TR 10, 12-14.

Additionally, although Plaintiff correctly notes that the ALJ did not specifically discuss statements made by Plaintiff's supervisor, James Wilson, Mr. Wilson did not provide "testimony" as Plaintiff avers, and Mr. Wilson's statements merely reflect his observations of Plaintiff's work as a rural mail carrier. Docket No. 13 at 16, *citing* TR 210-12. Further, although Mr. Wilson's statements are consistent with some of Plaintiff's allegations, they are not consistent with the medical evidence of record. TR 12-14, 25-38, 210-12. The ALJ must only give perceptible weight to statements of a lay witness when they are consistent with medical evidence. *See Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983).

The ALJ observed Plaintiff during her hearing, assessed the medical records, reached a reasoned decision, and appropriately articulated the basis for his decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

### 3. Residual Functional Capacity

Plaintiff maintains that there is "ample evidence in the medical record that Plaintiff is severely limited in the use of her left thumb resulting in a vocational limitation of no repetitive or no ongoing gripping." Docket No. 13 at 12. Plaintiff notes that the opinions of Drs. Seigel, Butler, Yuill, and Ali support this determination. *Id.* Plaintiff contends that because the ALJ failed to consider Plaintiff's left-thumb repetitive motion limitation, the ALJ's RFC finding does

33

not accurately reflect Plaintiff's impairments. *Id.* at 13.

Defendant does not directly respond to Plaintiff's RFC argument. Docket No. 14. Defendant does, however, contend that the medical assessments of Drs. Dyer, Larson, Magpantay, Siegel, Butler, and Yuill are not inconsistent with the ALJ's findings. *Id.* at 9-12.

Plaintiff reiterates her RFC argument in her Reply, arguing that the record supports Plaintiff's limited use of hands beyond the limitations reflected in the ALJ's RFC assessment. Docket No. 17 at 2-7. Regarding Dr. Magpantay's opinion, Plaintiff contends that the ALJ's RFC finding should have included a limitation for Plaintiff occasionally dropping objects because the ALJ concurred with Dr. Magpantay's assessment, which so included. *Id.* at 2. Discussing statements rendered by Drs. Butler and Yuill, Plaintiff contends that the ALJ's RFC assessment did not adequately reflect their determinations regarding Plaintiff's ability to perform repetitive hand motions. *Id.* at 4-5; TR 744, 891.

"Residual Functional Capacity" is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c). With regard to the evaluation of physical abilities in determining a claimant's RFC, the Regulations state:

> When we assess your physical abilities, we first assess the nature
> and extent of your physical limitations and then determine your
> residual functional capacity for work activity on a regular and
> continuing basis. A limited ability to perform certain physical
> demands of work activity, such as sitting, standing, walking,
> lifting, carrying, pushing, pulling, or other physical functions
> (including manipulative or postural functions, such as reaching,
> handling, stooping or crouching), may reduce your ability to do
> past work and other work.

20 C.F.R. § 404.1545(b).

As has been discussed in the statements of error above, the ALJ properly considered the medical and testimonial evidence of record, including the opinions of Drs. Seigel, Butler, Yuill, Ali, and Magpantay, and Plaintiff's arguments with regard to the ALJ's consideration of their opinions are unavailing. The ALJ, after evaluating all of the objective medical evidence of record and Plaintiff's reported level of activity, determined that Plaintiff retained the RFC for performing sedentary work *with numerous additional limitations*, including an inability to lift and carry more than ten pounds and a restriction from performing frequent reaching, handling, fingering, and feeling.[12] TR 11, 15. As can be seen, contrary to Plaintiff's assertion, her inability to perform repetitive hand motions is expressly factored in to the ALJ's RFC determination when he restricted Plaintiff from performing frequent reaching, handling, fingering, and feeling.

The ALJ properly considered the evidence of record, and his RFC finding adequately reflects Plaintiff's left-hand impairments. TR 11-14. Substantial evidence supports the ALJ's Residual Functional Capacity determination; accordingly, the ALJ's determination stands.

## 4. Existence of a Significant Number of Jobs

Plaintiff next maintains that the ALJ erred in failing to consider Plaintiff's left-thumb repetitive motion limitation in his finding that there were jobs existing in significant numbers that Plaintiff could perform. Docket No. 13 at 13. Plaintiff cites SSR 83-10 which states, "most unskilled sedentary jobs require good use of hands and fingers for repetitive hand-finger

---

[12] The limitations stated here are the limitations related specifically to Plaintiff's left-hand impairment that are contained in the ALJ's ultimate RFC finding, quoted *supra* p. 3, numbered para. 5.

35

actions." *Id., quoting* SSR 83-10.  Plaintiff continues by discussing the VE's hearing testimony

and his response to Plaintiff's attorney's question pertaining to repetitive motion hand

limitations. *Id.*, *citing* TR 42.  Plaintiff alleges that together, the physicians' opinions and the

VE's testimony support a determination that Plaintiff is severely limited regarding repetitive

motion of her left hand and that Plaintiff cannot perform the types of jobs associated with the

ALJ's RFC determination. *Id.*

Defendant does not directly respond to Plaintiff's contention regarding the VE's

testimony.  Docket No. 14.  In her Reply, Plaintiff further discusses the VE's testimony, arguing

that the VE testified that an inability to grip would preclude working in most sedentary jobs, and

that the ALJ's determination regarding jobs Plaintiff could perform does not adequately reflect

the evidence of record. Docket No. 17 at 3.

As explained above, the Commissioner has the burden at step five of the sequential

evaluation process of establishing the claimant's ability to work by proving the existence of a

significant number of jobs in the national economy that the claimant could perform, given his or

her age, experience, education, and residual functional capacity.  20 C.F.R. §§ 404.1520,

416.920.  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).  The Commissioner's

burden at step five can be satisfied by relying on the grid rules only if Plaintiff is not

significantly limited by nonexertional impairments, such as mental limitations, manipulative

limitations, or environmental limitations.  *Abbot v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990).

In the presence of nonexertional limitations that would preclude the application of the grid

regulations, "expert testimony would be required to satisfy the Secretary's burden of proof

regarding the availability of jobs which this particular claimant can exertionally handle." *Kirk v. Secretary*, 667 F.2d 524, 531 (6th Cir. 1983). In other words, the ALJ may rely on the testimony of a vocational expert in response to a hypothetical question as substantial evidence of the existence of a significant number of jobs that the claimant is capable of performing as long as the hypothetical question accurately represents the claimant's credible limitations. *See Varley*, 820 F.2d at 779 (*quoting O'Banner v. Secretary*, 587 F.2d 321, 323 (6th Cir. 1978)).

In the case at bar, as discussed above, the ALJ's decision specifically addressed Plaintiff's limitations, and his RFC determination expressly included restrictions directed at Plaintiff's left hand limitations, including restrictions against lifting or carrying more than ten pounds and restrictions on frequent reaching, handling, fingering, and feeling. TR 11-14. The ALJ further noted:

> If the claimant has the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.28 and Rule 201.21. However, the claimant's ability to perform all or substantially all of the requirements this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled sedentary occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all these factors the individual would be able to perform the requirements of representative occupations such as a stuffer with 349,000 nationally including 8,610 in the state of Tennessee; as a [*sic*] optical lens inserter with 81,000 nationally including 2,500 in the state of Tennessee; and as a jewelry preparer with 80,000 nationally including 1,160 in the state of Tennessee.

> Pursuant to SSR 00-4p, the vocational expert's testimony is

consistent with the information contained in the Dictionary of
Occupational Titles.

Based on the testimony of the vocational expert, the undersigned
concludes that, considering the claimant's age, education, work
experience, and residual functional capacity, the claimant is
capable of making a successful adjustment to other work that
exists in significant numbers in the national economy. A finding
of "not disabled" is therefore appropriate under the framework of
the above-cited rules.

TR 15-16, *referencing* TR 38-44.

The above quoted passage is consistent with the VE's testimony. TR 15-16, 38-44. With

regard to the hypothetical posed by the ALJ to the VE, the hearing transcript reads as follows:

Q    Okay. Well, I want you to consider that as past relevant
     work. Consider a hypothetical person of the same age and
     education as the claimant, and *consider a residual
     functional capacity for reduced range of sedentary work*
     with postural limitations precluding all but negligible
     climbing, balancing, stooping, kneeling, crouching and
     crawling. I'll define that term negligible as I use it in these
     hypotheticals, it's not an absolute zero or never, but it is
     closer to that level than it is to the next level up.

          The next level up, occasional is defined as up to
     one-third of the day, mid-way between zero and one-third
     is one-sixth, so I'm talking about less than one-sixth of the
     day. But still, not quite zero, still short of never, as I use
     the term. *With manipulative limitations, no more than
     frequent. That would rule out any constant reaching,
     handling, fingering, feeling.*

A    Yes, sir.

Q    Environmentally precluded from all but negligible
     exposure to the elements of weather, cold, hot, wet, humid
     environments, vibration, moving mechanical parts, electric

38

shock, hazardous exposed places, radiation, explosives, fumes, odors, dust, gasses, poor ventilation. Mentally limited to work involving no more than minimal contact with public, coworkers, supervisors. With an MRL of 2/2/2 or below, that's reasoning, math and language at the 2nd level, not the lowest level, the second level.

A       Yes, sir.

Q       And with pedal limitations, use of foot controls, negligible.

A       Yes, sir.

Q       See past work at the medium level would be ruled out by this sedentary RFC, would it not, Mr. Turner?

A       Yes, sir, it would; as she did not acquire any transferrable skills to the sedentary range with the limitations you provided. But *I do have a list of other occupations the hypothetical person can potentially be employed.*

Q       Okay. Well, why don't you give those to me then.

A       Yes sir. One occupation, Your Honor, is called a stuffer. It's for packaging as a [INAUDIBLE] machine operator. You stuff things like games, toys or sports equipment. It is sedentary, unskilled, SVP-2. The RML is 2/1/1, the DOT code is 731.685-014. In the state of Tennessee, there are 8,610 employed. And, nationally, 349,000. Also, Your Honor, an optical lens inserter. A lense inserter is also sedentary, unskilled occupation, with an SVP of 2. The RMLs are 1/1/1, the DOT code is 713.687-026. In the state of Tennessee, there are 2,500 employed. And, nationally, 81,000. Also, Your Honor, a jewelry preparer. A jewelry preparer namely prepares the jewelry for sale or distribution or manufacturing. They work in the jewelry, silverware [INAUDIBLE] industry. It is sedentary, unskilled, SVP-2. The RMLs are 2/1/1. The DOT code is

> 700.687-062. In the state of Tennessee, there is 1,160
> employed. And nationally, 80,000. *Those three
> occupations, Your Honor, do fit within the limitations you
> provided.*

TR 38-41.

As noted above, the ALJ's hypothetical question posed to the VE incorporated Plaintiff's

age, education, work experience, and expressed nonexertional impairments of postural,

manipulative, environmental, and mental limitations. *See* TR 38-41. The ALJ's hypothetical

question, therefore, accurately represented Plaintiff's limitations.

In making her argument regarding this statement of error, Plaintiff also discusses the

VE's responses to questions posed by Plaintiff's attorney, the exchange of which is as follows:

> BY THE ATTORNEY:
>
> Q    Would any of the jobs that you've named require any type
>      of repetitive motion of either the dominant or non-
>      dominant hand?
>
>
> A    Well, they are classified reaching, handling and fingering
>      and feeling as frequent so that's defined up to 75 percent of
>      the day, so you would be using your hands quite a bit.
>
>
> BY THE ADMINISTRATIVE LAW JUDGE:
>
> Q    There are occupations that require even greater use of the
>      hands then these?
>
>
> A    Oh, yes, sir. You could have constant. As a matter of fact,
>      Your Honor, most sedentary, unskilled occupations the
>      reaching, handling and finger [*sic*] is constant. So, with the
>      low RMLs like that, you can get entry-level work or so –
>      these jobs are a lot easier than the ones that are constant. . .
>
>
>                          . . .

40

BY THE ATTORNEY:

Q       So, the jobs you identified would require repetitive or
        ongoing gripping with, say, the left thumb?

A       Well, the Dictionary of Occupational Titles does not
        manipulatively break it down per finger or actually using –
        but you would be using your thumbs.  You're using all
        your fingers in both of your hands.

TR 42-43.

Although Plaintiff contends that the VE's answers to the questions posed by her attorney demonstrate that she cannot perform the jobs identified by the VE, as can be seen, the VE clarified that he included "low RMLs" in the jobs he identified as appropriate and that those would allow for entry-level work, which, although would require use of the fingers in both hands, Plaintiff could perform given her expressed restrictions.  *See* TR 38-43.

As discussed, the ALJ's hypothetical question accurately represented Plaintiff's exertional and nonexertional limitations.  Because the ALJ's hypothetical question accurately represented Plaintiff's limitations, the ALJ properly relied on the VE's answers to prove the existence of a significant number of jobs in the national economy that Plaintiff could perform. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary*, 823 F.2d 922, 927-928 (6th Cir. 1987); and *Varley*, 820 F.2d at 779.  Accordingly, Plaintiff's claim fails.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

41

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge

42